(Nos. 31563, 31680.—

EVELYN ALTSCHULER *et al.,* Appellants, *vs.* IRWIN I. ALTSCHULER, Appellee.

*Opinion filed September 21, 1951—Rehearing denied Nov. 19, 1951.*

FRANKLIN J. STRANSKY, BERNARD YEDOR, and STAN-FORD CLINTON, all of Chicago, for appellants and plaintiffs in error.

MOSES, BACHRACH & KENNEDY, of Chicago, (WALTER BACHRACH, STANLEY J. MORRIS, WILLIAM C. WINES, and MORRIS SOLOMON, of counsel,) for appellee and defendant in error.

Mr. JUSTICE FULTON delivered the opinion of the court:

This case originated in the superior court of Cook County by the plaintiffs, the widow and children of Samuel Altschuler, filing a complaint for an accounting against Irwin I. Altschuler as surviving partner of a partnership composed of Samuel Altschuler during his lifetime and the said Irwin I. Altschuler, and for partition of certain real estate allegedly owned by them as tenants in common. The case was previously before this court and a statement of the case is reported in 399 Ill. 559. In our prior opinion we limited the finding to a determination of whether the decree entered by the superior court was final and appealable. That decree held that during the period from July 10, 1930, to and including February 10, 1945, the defendant sustained a fiduciary relationship to Samuel Altschuler and

owed him a duty to account, and the decree ordered an accounting of all his acts and doings during that period as administrator of the estate of Isaac Altschuler, the deceased father of Samuel and Irwin, as trustee and agent under a written appointment by the widow and heirs of Isaac Altschuler, as a copartner with Samuel in the operation of an iron and steel business, and as a joint depositor with Samuel of certain funds in the First National Bank of Chicago in a joint account in the name of Samuel and Irwin. In that case we held that the decree appealed from was final and that the action of the Appellate Court in dismissing the appeal should be reversed and the cause remanded to the Appellate Court with directions to consider the case on its merits.

Upon the cause being remanded, the Appellate Court reconsidered the case, reversed the decree and remanded the cause to the superior court with directions to dismiss the complaint for want of equity at plaintiff's cost, and for further proceedings not inconsistent with the views expressed in the opinion as to a counterclaim by the defendant seeking specific performance of an option to purchase Samuel's interest in the partnership. It also modified a subsequent decree of the superior court which had taxed the master's fees and other costs against the defendant. This decision is reported in 340 Ill. App. 220.

The Appellate Court, besides reversing the decree of the superior court, determined the individual rights and interests of plaintiff Evelyn Altschuler and the defendant in the real estate upon which partition had been sought by said plaintiff, since it held that the real estate was part of the assets of the partnership and that Samuel and Irwin were not tenants in common of said real estate, although all jurisdiction over the real estate and the right to partition thereof had been reserved by the superior court in its original decree. The plaintiffs filed a petition for leave to appeal from the Appellate Court to review the decision

of that court, which petition was granted, and also brought a writ of error in this court to review the judgment of the Appellate Court holding that the real estate was partnership property. The appeal and the writ of error were consolidated in this court for hearing and likewise are consolidated for decision.

The defendant filed a motion to dismiss the writ of error on the ground that the writ was not sued out of the Supreme Court prior to the expiration of 90 days from the entry by the Appellate Court of the judgment complained of. This motion was taken with the case and presents the question: Does the 90-day limitation for appeal in section 76 of the Civil Practice Act apply to a common-law writ of error to review a judgment of the Appellate Court in which that court, for the first time, has passed upon and determined the rights of the parties in a freehold estate, or where a constitutional question for the first time has been injected into the case by the judgment of the Appellate Court. It appears that this question has never been previously decided by this court.

Section 11 of article VI of our constitution provides for the creation of an inferior Appellate Court of uniform organization and jurisdiction upon which jurisdiction may be conferred and from which appeals and writs of error may lie to this court in all criminal cases and cases in which a franchise or freehold or the validity of a statute is involved, and in such other cases as may be provided by law. Section 75 of the Civil Practice Act (Ill. Rev. Stat. 1949, chap. 110, par. 199,) provides that the Supreme Court may review the judgments and decrees of the Appellate Court in certain cases but specifically excepts those cases wherein appeals are required by the constitution to be allowed from the Appellate Court to the Supreme Court. An examination of sections 74, 75 and 76 of the Civil Practice Act indicates that no provision has been made by the legislature for the mode of prosecuting appeals and

writs of error from the Appellate Court to the Supreme Court in criminal cases and cases in which a franchise or freehold or constitutional question is involved. Section 11 of article VI of the constitution makes it mandatory that a writ of error issue from this court to review the judgment of the Appellate Court in all criminal cases, and cases in which a freehold or franchise or the validity of a statute or the construction of the constitution is involved. We, therefore, hold that the 90-day time limitation provided by the Civil Practice Act is not applicable to a writ of error issued by this court to review the judgment of the Appellate Court where it is mandatory for this court to review such judgment. In the case at bar it appears that a freehold was involved originally in the superior court and that court by its decree, which is appealed from, reserved unto itself the jurisdiction with reference to the partition of said real estate. It held that the real estate was not a partnership asset, and, in so holding, a freehold was not involved and was not presented in the prior appeal to this court reported in 399 Ill. 559. The Appellate Court by its decision has held that the real estate is a partnership asset which is contrary to the allegations of the complaint and, therefore, a freehold has become involved for the first time in that court. The defendant has never contended that he had any individual interest in the real estate except as a partnership asset. No freehold could possibly be involved in an appeal by him. Plaintiff Evelyn Altschuler, however, has always claimed individual ownership of the real estate, and thus any decision by any court holding it to be a partnership asset has deprived her of a freehold. Said plaintiff was entitled to a writ of error to review the action of the Appellate Court in this case. The motion to dismiss the writ of error is, therefore, denied.

We shall first consider the ownership of the real estate of which partition was sought. This real estate was originally owned by Isaac Altschuler and his wife, Ida Alt-

schuler, the parents of Samuel and Irwin, as joint tenants and not as tenants in common. Upon the death of Isaac it passed to Ida. Said property had been used by Isaac and after his death was used by the family for the conduct of the business of the Altschuler Iron and Steel Company. Upon the death of Ida Altschuler the property, by her will, passed equally to her four children, Irwin, Samuel, Sadie and Sarah, share and share alike. She also owned other property which passed to her children in the same manner. About a year and a half after the estate of Ida Altschuler was closed the four children agreed to a partition and a division of the property which they had inherited from their mother. By an exchange of deeds between them the two daughters received certain improved property and the two sons received the property upon which was situated the business. The value of the property was such that by this division the daughters received more valuable property than did the two sons. The Appellate Court by its decision holds that this fact is indicative of the intention of the two sons to acquire this property as partnership property. The Appellate Court further points out that the taxes and repairs had been paid out of partnership funds. We believe that this decision by the Appellate Court is erroneous and not supported by the record in this case since it is apparent that the real estate upon which the business was conducted has never been treated as an asset of the business. When Ida Altschuler owned the property, the business continued to pay the taxes and repairs and she paid no rent, so that the conduct of Samuel and Irwin in making these payments does not seem to have much bearing in determining whether or not they considered the property as being partnership property. Likewise, at the death of Isaac, even though Ida was a joint tenant in the real estate she had only the statutory interest of a widow in the business. Historically, the family had not considered the real estate as part of the business, since, even at the time Irwin sup-

posedly acquired Ida's and Sarah's interest in the business, he did not acquire Ida's interest in the real estate. Furthermore, it appears from the record . that the will of Samuel specifically devises his interest in this property unto his wife individually. It further appears from the record that the arrangements for drafting of this will were made by Irwin and that he told the attorney who prepared it what the will should contain, and Irwin was a witness to the will. Certainly, if the real estate were considered a partnership asset it would not have been specifically devised to the wife and the interest in the business bequeathed in a different manner, as Samuel did in his will. Furthermore, if Irwin and Samuel were in dispute as to whether the real estate were a partnership asset, Irwin certainly would not have permitted the will to be so prepared without objection on his part. We hold that the decision of the Appellate Court with reference to the real estate is erroneous and that such real estate did not form or constitute a partnership asset.

We next consider the question of the tender by Irwin of the sum of $90,577.33 for the purchase of the interest of Samuel in the partnership and its assets. In view of the fact that the value of the partnership as stated by Irwin included therein the value of the real estate, the tender was not accurate and was not sufficient. In view of the fact that the partnership agreement did not contain a time limit within which the option to purchase should be exercised, we hold that the exercise was ineffectual only as to the amount tendered and not as to the time within which it could be exercised. We likewise believe that the relationship between the partners was such that it would be very difficult to arrive at an account between them and that, until an account has been stated or determined, the option should remain in full force and effect. We hold that the option was not exercised and that the option still continues, but that the decision of the Appellate Court with

reference to enforcing the agreement to sell the deceased's interest in the business is erroneous.

We shall next consider the question regarding the accounting, as decreed by the superior court. It held by its decree that Irwin occupied a fiduicary relationship to Samuel and owed him a duty to account (1) as administrator of the estate of Isaac Altschuler, (2) as agent or trustee in the management and operation of the business under a written appointment by the Altschuler family, and (3) as copartner with Samuel in the operation of the business and as codepositor of funds in a joint bank account. The court further found that the defendant acted as agent and trustee for the family from July 14, 1930, through the entire year 1937 and into a part of 1938 and that the partnership between him and Samuel began in the early part of 1938 and continued without interruption until Samuel's death.

There is no question as to the duty of a surviving copartner to account to the estate of the deceased partner, under section 43 of the Uniform Partnership Act. (Ill. Rev. Stat. 1949, chap. 106, par. 43.) As we have stated above, the account rendered was not satisfactory and we believe that the trial court was correct in ordering an accounting by Irwin of all money, property and assets of the partnership business at the death of Samuel, together with all sums, profits, capital gains, accounts and notes payable and other credits derived from the operation of the business after the death of Samuel. In view of the fact that the record here shows that there was no accounting between the two partners from the date of the beginning of their partnership until Samuel's death, Irwin is under a duty to account during that period. It has been held that partners act toward one another in a fiduciary capacity, (*Einsweiler* v. *Einsweiler*, 390 Ill. 286; *Grossberg* v. *Haffenberg*, 367 Ill. 284,) and, therefore, it follows that Irwin was under a duty to account for the funds deposited in

the First National Bank of Chicago in the joint bank account of Samuel and Irwin, including the disposition made of the money of said account, the securities purchased with said funds, and the proceeds derived from the sale of such securities.

In order to determine the periods which said accountings should cover, it is necessary to review the facts showing the relationship of the parties. From the evidence it appears that Isaac Altschuler owned and operated the business in his lifetime and maintained a commercial banking account in the name of Altschuler Iron and Steel Company at the South Chicago Savings Bank and another such account in the company name at the Calumet National Bank. Irwin, the eldest son, was employed by his father in the conduct of the business. Samuel, however, was not so employed. In 1929 Irwin established at East Chicago, Indiana, a small brokerage concern known as the Calumet Purchasing Company, in connection with the obtaining of scrap metal for resale to the Altschuler Iron and Steel Company. A bank account in the name of Calumet Purchasing Company was opened in January, 1929, by Irwin at the I. C. Bank and Trust Company. At this time Irwin was somewhat interested in other enterprises, in 1929 having acquired a substantial stock interest in the Hammond Brass Works and being president of that company at a fixed salary. Likewise, in that year he was a stockholder and director of the I. C. Bank and Trust Company. Irwin has remained an officer, director, and shareholder of the said corporations and is now chairman of the board of directors of the National Bank of Hyde Park, which formerly was known as the I. C. Bank & Trust Company.

On July 10, 1930, Isaac Altschuler died intestate leaving him surviving, as his only heirs-at-law, his widow and the four children, namely, Irwin, Samuel, Sadie and Sarah. On July 22, 1930, a joint petition was filed in the probate court of Cook County requesting the appointment of Irwin

as administrator of the estate and on the same date letters were issued to him. At that time all of the heirs signed an authorization for Irwin to continue to conduct the business which is as follows:

"Chicago, Illinois
July 14th, 1930.

Irwin I. Altschuler,
Administrator of the
Estate of Isaac Altschuler, deceased.

Dear Sir:

We, the undersigned, being all the heirs at law and next of kin of Isaac Altschuler, Deceased, do hereby authorize and empower you, as administrator of said estate, to continue and conduct and manage the business of said Isaac Altschuler, now deceased, known as Altschuler Iron & Steel Company, located at 3123 E. 91st Street, Chicago, Illinois; and to do all things necessary for the proper operation of said business for the best interests of all parties beneficially interested therein."

On August 4, 1930, Irwin petitioned the probate court for leave to continue the business and the court entered an order granting him such authority. On September 8, 1930, Irwin, as administrator, filed in the probate court an inventory in which he listed as the assets of the estate, "Business of said decedent known as Altschuler Iron and Steel Company located at 3123 E. 91st Street, Chicago, Illinois— $153,677.22." This inventory also contained an itemization of the assets and liabilities of the business as of July 10, 1930.

The administrator did not sell or liquidate the business but continued it during the period of administration. Samuel became employed in the business in July, 1930, soon after his father's death and remained so employed until his death. The bank accounts of the company were retained by the administrator and were used by him in the conduct of the business. Purchase of scrap metal through the brokerage concern known as the Calumet Pur-

chasing Company was not terminated, although the amount obtained through it during the period of administration was somewhat diminished. Brokerage fees were paid by the estate to that firm, of which Irwin was the owner.

A simple system of books and records begun by Isaac during his lifetime was continued by the administrator and was still in use 15 years later when Samuel died. This system was very simple and consisted only of entering receipts and disbursements of the business in a check register. Accounts receivable and payable of the company were kept in binders in the form of invoices or duplicate invoices for merchandise purchased and sold. It does not appear that any record was kept of the transactions of the business other than that shown upon the check registers, so that all cash transactions of the business were not necessarily shown upon the records kept by the administrator and by the subsequent partnership. Duplicate deposit tickets of the various deposits made in the bank accounts of the business were generally retained, evidencing the amount of money deposited with the bank.

It is interesting to note that while Samuel's duties in the business were supposedly those of looking after the office, a high percentage of the entries made in the books was made in the handwriting of Irwin and all large transactions appear to have been made by him alone.

On October 7, 1931, the administrator filed his final account and report with the probate court, in which he stated that the entire assets of said estate consisted of the business of the decedent known as Altschuler Iron and Steel Company, that he had conducted, operated, and managed said business in accordance with the authority granted him by the heirs-at-law and next of kin, that they had examined the final account and report and approved the same, and that all the assets of the estate had been distributed in accordance with the law. The heirs, including Samuel, gave the administrator a receipt wherein they

acknowledged receipt of their respective undivided interests "in and to all of the assets of the estate of said Isaac Altschuler deceased, consisting of the business of the deceased known as the Altschuler Iron and Steel Company in full payment of my distributive share in said estate." An entry of appearance was signed by all the heirs and filed in the matter of the hearing on the final report, which provided, "we do further hereby certify that we have examined the final account and report of said Administrator and do hereby approve the same in every respect and consent to an order approving the same and discharging said Irwin Altschuler as Administrator and cancelling his bond." The final report as filed in the probate court and approved did not contain any statement of the income by said administrator during administration but merely recited the disbursements made in the total sum of $6850.25. The disbursements were 16 in number and covered personal property taxes of $1200, attorneys fees of $3000, cemetery lot $500, Illinois State Inheritance Tax of $921.45, and other lesser payments of administration expenses. This report was certainly not a final report in the true sense of the word, since it contained merely a report of the disbursements made by the administrator and did not account in any respect for the assets of the estate other than the general statement that the assets consisted of the business known as the Altschuler Iron and Steel Company, which was appraised at the sum of $153,677.22, as set forth in the inventory filed in the estate.

The defendant asserts that the order closing the estate, entered by the probate court, was a final and appealable order and since no appeal was taken therefrom the plaintiff cannot now question the administration of that estate. We do not agree with this contention, for the reason that it clearly appears from the records that the report labeled "final report" and filed by the administrator did not contain, nor was it intended to contain, a full report of his

acts and doings. Likewise, the final receipt signed by each of the heirs did not recite any specific amount of money or property received other than the bald statement that they had each received their respective shares in the Altschuler Iron and Steel Company. What their respective shares amounted to in the form of money or property at that date is not contained in any report filed in the probate court and, therefore, Irwin was under a duty to individually account to the heirs for his acts and doings in the conduct of said estate during said period of administration. Defendant has not asserted herein that he ever furnished any of the heirs an account of his conduct of the business and we assume, therefore, that none was ever furnished.

From October 7, 1931, until December 31, 1936, it appears that the business was conducted by Irwin and Samuel much as it had been in the past. Sometime in 1931 Sadie Danziger, one of the daughters, sold and relinquished her undivided one-sixth interest in the business. Irwin contends that this was sold to the other members of the family and that she merely withdrew from the firm and was paid her share of the assets of the firm from the income of the firm. The plaintiff contends that Samuel purchased Sadie's interest. At this point it is interesting to note that neither Sarah Steinberg nor Sadie Danziger, the two sisters, appear as witnesses for either of the parties to this suit. There is no writing in evidence of the transfer of Sadie Danziger either to Samuel or to the other members of the family or of her withdrawal from the firm. However, certified copies of the report of the internal revenue agent covering the verification of partnership income tax returns of the Altschuler Iron and Steel Company for the years 1934, 1935 and 1936 are in evidence. From these reports it appears that the interest, as of December 31, 1934, in the income of the partnership was one third to Ida, the mother, one third to Samuel, one sixth to Sarah, and one sixth to Irwin, and that Sadie

was not the recipient of any income during that year. To the same effect are the reports for the years 1935 and 1936. These reports contain the statement, "Partnership was organized in October, 1931, by reason of closing of the estate of I. Altschuler, deceased." They further contain the statement, "The changes were discussed with: J. H. Clancy, representative, who agreed. Agreement received on partners." From the evidence it appears that J. H. Clancy was the accounting representative of Irwin and Samuel in the business, and that he prepared the income tax return and handled other tax matters for the men. We believe that the manifest weight of the evidence indicates that Samuel Altschuler had acquired the undivided one-sixth interest of Sadie Danziger prior to 1934. Whether he paid for this interest individually or the same was paid for from partnership funds would be a matter which an accounting of the activities of the partnership during that period of time will show. There does not appear any evidence in this record showing the circumstances of the acquisition of Sadie's interest, but it is certainly clear, from the manner in which the income was distributed, that the acquisition of Sadie's interest was by Samuel.

During the period from October 7, 1931, until December 31, 1936, the system of books which had been previously carried on by Isaac Altschuler was continued. During this period of time the firm carried a bank account at the South Chicago Savings Bank until September 14, 1936, when that account was closed. The Calumet National Bank went out of existence and a new commercial account in the name of the company was opened on January 2, 1932, with the I. C. Bank and Trust Company, later known as the National Bank of Hyde Park, of which Irwin is chairman of the board of directors. Likewise, the company carried a commercial account at the First National Bank of Chicago from March 21, 1933, until January 2,

1935. During the period from 1931 to 1933 the defendant contends that he made loans to the firm in various amounts totaling the sum of $188,483.40. He asserts that the loans in question were without interest but were evidenced by notes of the company signed by both Irwin and Samuel. This entire sum of money was repaid to the defendant out of company funds in the years 1934 and 1937. There is considerable dispute as to whether or not these loans were made by the defendant and if so whether or not they were made by him from funds belonging to him personally or from funds which he had previously withdrawn from the business without authority from the other heirs. It appears that each one of the entries in the check registers of the firm, showing these loans, was made in the handwriting of Irwin and likewise each of the entries showing payment of these loans was made in his handwriting as were the checks in payment of these loans. These entries show that these notes which were supposedly given for the loans were numbered from 1 to 13, inclusive, but none of the cancelled notes are in evidence or appear to have been preserved.

On December 31, 1936, an agreement in writing was entered into by and between Irwin I. Altschuler, as party of the first part, Ida Altschuler, as party of the second part, and Sarah Altschuler Steinberg, as a third party. The agreement provided for the purchase by Irwin I. Altschuler of the interest of the two women in the business of the Altschuler Iron and Steel Company. The agreement recited that the widow, Ida Altschuler, was entitled to an undivided one-third of the business and that the daughter, Sarah Altschuler Steinberg, was entitled to an undivided one-sixth interest in the said business. It set forth the filing of the final account and report of Irwin as administrator of the Isaac Altschuler estate, and the approval thereof; that from October 7, 1931, to the date of the

agreement, Irwin had managed the business for the use and benefit of his mother and sister, and others beneficially interested therein; that substantial payments had been made to the mother and sister out of the cash receipts, which payments had been applied against their respective interests; that a full and accurate inventory and appraisement of the assets of the business had been made; that it was the intention of Samuel and Irwin Altschuler to remain in the business of said company and the intention of the widow and sister to withdraw.

The agreement further provided for the dissolution of the relationship existing between the parties thereto as copartners and for conveyance to Irwin Altschuler of all the title and interest of the widow and the daughter in the assets of the business of every kind and character, including all moneys in the trust fund. In return, Irwin agreed to pay to Ida Altschuler the sum of $15,000 at the rate of $1000 per month and he further agreed to pay to Sarah Altschuler Steinberg the sum of $10,000 in monthly installments of $350 each, each of said sums to be evidenced by a promissory note.

The agreement also recites release of the mother and daughter from all liability arising out of the conduct of the business of the Altschuler Iron and Steel Company, as well as a release to Irwin and complete discharge from all of his acts and doings in connection with his operation of said business from October 7, 1931, to the date of the agreement, December 31, 1936.

An executed copy of this agreement, although not containing the signature of Ida Altschuler, was duly proved, inasmuch as the attorney who prepared the agreement testified that he took the agreement to the office of the firm and obtained Irwin's signature thereto and then took it to the hotel at which Sarah and her mother resided and obtained their signatures thereto. He states that the signa-

ture of Mrs. Altschuler was obtained by mark, and that she evidently signed only the original which she retained and which is not available at this time.

On this same day, December 31, 1936, the same attorney who prepared the agreement between Irwin and his mother and Sarah likewise testified that he met with Samuel and Irwin at their place of business and had them sign a written partnership agreement which he had previously prepared. This partnership agreement was as follows:

### "AGREEMENT.

THIS AGREEMENT, made and entered into this 31st day of December, A.D. 1936, by and between IRWIN I. ALTSCHULER, hereinafter referred to as First Party, and SAM ALTSCHULER hereinafter referred to as Second Party, both of the City of Chicago, County of Cook and State of Illinois, WITNESSETH:

WHEREAS, the Parties hereto have for some time been engaged together in the scrap iron and metal business under the name, style and description of Altschuler Iron and Steel Company, located at 3123 East 91st Street, Chicago, Illinois; and

WHEREAS, their respective interests in said business have, through various circumstances, changed, and the Parties hereto are now the sole owners of said business; and

WHEREAS, the Parties hereto desire to continue said business as a co-partnership, and desire to state an account between them as of this date, and to reduce the same to writing, setting forth their mutual interests, rights, obligations therein;

Now THEREFORE, In Consideration of the premises, and in consideration of the sum of One Dollar ($1.00) by each to the other in hand paid, the receipt whereof being hereby acknowledged, and in further consideration of the mutual covenants, stipulations and agreements hereinafter set forth, IT Is MUTUALLY AGREED by and between the above named Parties, as follows:

1. The Parties hereto have agreed to become and remain partners in the scrap iron and metal business and all things incidental and necessary and convenient to said business, under the firm name and style of Altschuler Iron and Steel Company.

2. This co-partnership shall continue from the date of this agreement until the same shall, by mutual agreement or by operation of law, be dissolved. The place of business shall be at 3123 East 91st Street, Chicago, Illinois, or at such other place or places as the Parties hereto may hereafter, by agreement, designate.

3. The Second Party agrees to give and devote his entire time and attention to said business, and both Parties shall exert their best endeavors for managing and conducting the business of the co-partnership. It is understood that the First Party has other business interests outside of this co-partnership but the said First Party agrees to give and devote so much of his time and attention as the business of said co-partnership shall require, and as he, the said First Party, has in the past given and devoted to the said business.

4. It is understood and agreed that the First Party has contributed to the said co-partnership two-thirds (⅔rd) of all of the assets which it now has or owns, and the Second Party has contributed one-third (⅓rd) thereof.

5. The Co-partners shall be entitled to the net profits arising from said business and remaining after the payment of all just co-partnership debts, such profits to be divided two-thirds (⅔rds) to the First Party, and one-third (⅓rd) to the Second Party. The First Party shall receive a salary of Two Hundred Fifty Dollars ($250.00) per week, and the Second Party shall receive a salary of One Hundred Twenty-Five Dollars ($125.00) per week, and these salaries shall be drawn by the respective Parties until such time as the amount and manner of payment shall be otherwise determined by mutual agreement.

6. All rents, cost of repairs and alterations required in said business, and all rates, taxes, cost of insurance, and other disbursements in respect to the operation of said business, and the wages or salaries of any or all persons employed in said business, and all other monies to be payable on account of said business, and all losses which shall happen to the same, shall be paid out of the capital of the co-partnership, and the profits arising therefrom, and, if same shall be deficient, then, by the co-partners, the First Party to the extent of two-thirds (⅔rd) thereof, and the Second Party to the extent of one-third (⅓rd) thereof.

7. There shall at all times be kept by the Parties hereto just and true books of account, wherein shall be entered in due form all sales, purchases, receipts, payments, engagements, transactions and property of the co-partnership; and the said books of account and all securities, papers and writings of the co-partnership shall be kept at the place where the business is carried on, and each co-partner shall have free access at all times to examine and copy out of the same.

8. Neither Party hereto shall, without the previous consent in writing of the other co-partner, enter into any bond or become bail or surety for any person, or endorse any note or other instrument for any person, or do or willingly suffer to be done anything whereby the capital or property of the co-partnership may become

liable to be attached or taken in execution. Each co-partner shall punctually pay his separate debts and indemnify the other co-partner, and the capital and property of the co-partnership, against the same, and all expenses on account thereof.

9. All monies which shall from time to time be received for and on account of the co-partnership, not required for current expenses, shall be deposited immediately in a bank, chosen by the co-partnership as the depositary of the co-partnership funds, in the same checks, drafts, bills, cash or remittances in which they are received, and all disbursements for and on account of the co-partnership shall be made by check on such bank or banks; either of the Parties hereto may sign checks.

10. Upon the dissolution of this co-partnership, by mutual agreement of the Parties hereto or by operation of law, a complete account of the business shall be taken and the assets of the co-partnership, after provision made for payment of all just debts and expenses of the co-partnership business, shall be distributed in the following manner, to-wit: Two-thirds (⅔rds) to the First Party, and One-Third (⅓rd) to the Second Party; and all losses suffered by the said co-partnership shall be borne by the respective Parties in the same proportion.

11. In the event that either of the Parties hereto shall desire to withdraw from said co-partnership or, in the event of the death of either co-partner, the remaining Party shall have the option of purchasing the interest of such withdrawing or deceased Party. In either of these events, an account shall be taken of all of the co-partnership property and provision made for payment of all just debts and liabilities of the co-partnership. Subject to such provision, the remaining or surviving co-partner shall pay the amount determined to be due to the withdrawing co-partner, or the heirs, executors or representatives of such deceased co-partner, in the same proportions as hereinbefore set forth, to-wit: To the First Party or his heirs, executors or assigns a sum equal to Two-Thirds (⅔rds) of the remaining net assets, and to the Second Party or his heirs, executors or assigns, a sum equal to One-Third (⅓rd) of the remaining net assets.

12. This Agreement shall be binding and conclusive upon the heirs, executors, administrators and assigns of the respective Parties hereto.

In Witness Whereof, the Parties hereto have set their hands and seals the day and year first above written.

IRWIN I. ALTSCHULER, (SEAL)
First Party.

SAM ALTSCHULER, (SEAL)
Second Party."

It is to be noted that this agreement, in paragraph 4, contained the statement that the parties agreed that Irwin had contributed two thirds of all the assets of this partnership and that Samuel had contributed one third thereof, but it does not contain releasing clauses covering the operation of the business from October 7, 1931, as did the agreement with the mother and sister. Likewise, it does not refer to any trust funds, as did that agreement. Plaintiff Evelyn Altschuler testified that she doubted that the signature to this agreement was that of her husband, but upon further examination she stated that she had seen his signature thereon in the year 1938. We hold that the manifest weight of the evidence is that this partnership agreement was executed by the parties on the date it bore.

After December 31, 1936, the business was operated much as it had been previously. Various payments were made to Ida and Sarah and at times it appears that payments were made to Sadie from the partnership. From the evidence in the record it does not appear that any allocation of these payments was made between Samuel or Irwin.

After December 31, 1936, Irwin and Samuel continued in business together, and in 1937 the partnership income tax return shows that the profits were split equally between them. In 1938 there was a loss, and it appears that the loss was allocated equally between them. In 1939, 1940, 1941, 1942, 1943, and 1944 the profits were split between the two men, two thirds going to Irwin and one third going to Samuel. It is interesting to note that in 1939 $2000 was paid to Sadie Danziger, and that in the years 1940, 1942, 1943, and 1944 Sarah Steinberg received sums of money which appear to be in excess of the amount Irwin was legally obligated to pay her in accordance with his agreement with her of December 31, 1936. All of these payments were entered in the check register as payments to "A/C Estate."

At this point it should be pointed out that on May 4, 1938, Samuel and Irwin opened a commercial banking account in the First National Bank of Chicago in the names or Irwin I. or Sam Altschuler. The initial deposit in that account amounted to $203,531.25, which represented the proceeds of United States Treasury bonds previously owned by the Altschuler Iron and Steel Company, which were sold. In the years 1938, 1939, and 1940 funds of this joint account were used to purchase shares of stock in various corporations. The stocks were bought through a brokerage account maintained by Samuel with a brokerage firm in Chicago. Certain stock certificates thus acquired were issued in the name of Samuel. These certificates were kept in a safety-deposit box owned by Irwin. Dividends from these stocks were deposited in the joint account, but it appears that Samuel reported these dividends on his personal income tax return. At infrequent times some funds of this joint account were used for the purpose of making small loans to the Hammond Brass Works, to Samuel's mother-in-law, and for the purchase of shares of stock for Sadie and Irwin. There were no books kept covering transactions in this account other than a separate check register for this account. It appears that Irwin wrote the checks on this account and kept these records. Not even Clancy, the auditor, had any knowledge of this account.

In December, 1944, Samuel Altschuler was seriously ill with cancer and was confined to his bed, having ceased working the previous month. The family thought that his death was imminent. On December 18, 1944, there was $56,469.63 of cash on deposit in the joint account and there were in the safety-deposit box of Irwin at the National Bank of Hyde Park stock certificates evidencing shares of stock at a cost value of $124,565.42, all issued in the name of Samuel. Likewise, there were charges on the check register of the account in the sum of $58,453.89 for

stock purchases made by Irwin for his own use. There was owing to Sadie Danziger a balance of $875 by reason of the transactions previously conducted in that account for her benefit.

On December 19, 1944, Irwin withdrew from the joint account by check which he signed and made payable to himself the sum of $56,500, leaving a debit in the account of $30. He also took the shares of stock from the safety-deposit box and placed orders with the brokerage firm to sell this stock through the brokerage account of Samuel. Irwin then endorsed Samuel's name on the reverse side of the stock certificates, except two certificates which had previously been endorsed in blank by Samuel, and sold the shares of stock for $81,923.34. On December 21, 1944, the brokerage firm issued their check in that amount payable to Samuel Altschuler, and Irwin obtained the check and endorsed Samuel's name thereon and deposited it in the joint account at the First National Bank. Shortly thereafter he completed the sale of the rest of the stock on December 26, 1944, and received a check in the amount of $20,825.98, payable to Samuel, which was endorsed by Irwin, together with $3,050 dividends, and deposited the same in the joint account. On December 27, Irwin withdrew from the joint account by checks payable to and signed by himself, the sum of $100,000. He continued selling these stocks until on January 10, 1945, when he disposed of all of them, deposited the funds in the joint bank account, checked out those funds to himself, and deposited the same in his own personal bank account. One month later Samuel Altschuler died, and shortly thereafter Irwin, in a discussion with plaintiff Evelyn Altschuler's brother, made a preliminary report to him of these transactions. Said plaintiff insists that these transactions were made without the authority of Samuel and without his knowledge or the knowledge of the plaintiff. For purposes of this opinion we do not deem it necessary

to determine whether or not the transactions were conducted with or without the consent of Samuel and his wife. Needless to say, the transactions were unusual and were conducted at such time and under such circumstances as to beyond question require the defendant to fully account and report with reference thereto.

Shortly before the death of Samuel and at about the same time the liquidating of the joint account took place, Samuel drew his last will and testament. From the evidence it appears that the will was prepared by an attorney selected by Irwin, and that Irwin conferred with the attorney with reference to the preparation of the will, came with the attorney to the residence of Samuel, and was aware of what was in the will. He was one of the attesting witnesses to the will. This will, as we have pointed out above, specifically devised to the widow the interest in the business real estate which Samuel owned.

The decree from which this appeal arose ordered that the defendant, during all of the time intervening between July 10, 1930, being the date of Isaac Altschuler's death, through the 10th day of February, 1945, being the date of the death of Samuel Altschuler, sustained a fiduciary relationship to the said Samuel, and as such fiduciary he was ordered to make a true and full and complete accounting of and concerning (1) his acts and doings as administrator of the estate of Isaac Altschuler, deceased, including all money, property and assets of said estate, both those heretofore inventoried by him and those not inventoried, including an account of all transactions had between defendant and the Calumet Purchasing Company while defendant was acting as administrator of the estate of Isaac Altschuler, deceased, and as trustee and agent under said written appointment of July 14, 1930, together with all moneys derived by defendant from such transactions; (2) his acts and doings as trustee or agent under written appointment by Ida Altschuler, widow of Isaac Altschuler,

deceased, and the other members of the family; (3) his acts concerning the business and affairs of the Altschuler Iron and Steel Company while operating said business as a copartner with the said Samuel Altschuler up to the time of the death of Samuel on February 10, 1945, and that he should make a full and complete accounting of and concerning the certain funds deposited in the First National Bank of Chicago on May 4, 1938, together with the disposition made of the moneys of said account, amounting to the sum of $203,413.25, together with the bonds, stocks and other securities purchased with said funds and together with the proceeds derived from the sale of said stocks, bonds and other securities, and together with any stocks, bonds or other securities purchased with said funds and now in the possession of said defendant, or, in case the same have been sold, that he account for the amount of moneys received by him on account of the sale thereof; and (4) that he make a complete accounting to plaintiffs of all moneys, property and assets of the business of said Altschuler Iron and Steel Company from the date of the death of Samuel to the date of making of said account.

As will be seen from the court order from which this appeal is perfected, the court holds that the defendant occupied a fiduciary relationship, but the decree does not hold that he has in any way violated the trust or confidence placed in him by Samuel or the other members of his family. Our review, therefore, of this case is limited to determining whether or not the trial court and the Appellate Court properly decided the question whether or not defendant occupied a fiduciary relationship, and, secondly, whether or not he is under a duty to account.

A recital of these facts portrays a peculiar situation, since none of the parties hereto contend that Samuel was not legally competent to transact business at all times during his lifetime. Furthermore, the record indicates that Samuel worked daily at the office of the firm, had access

to all the books and records and did make some entries therein. There is no evidence indicating that he complained at all with reference to the treatment of him by the defendant at any time. The situation is further complicated by the fact that the evidence for the plaintiffs consists of numerous circumstances of a type subject to two interpretations, either that the defendant was violating the trust placed in him, or that they were common transactions between members of a closely knit family group. The law is clear that a surviving partner is under a duty to account for all transactions with reference to the partnership from its inception until the date of death of the deceased partner. We, therefore, hold that the plaintiffs are entitled to an accounting for the period from December 31, 1936, to the date of the accounting.

The situation with reference to the transactions which occurred prior to December 31, 1936, presents a somewhat more difficult problem. As we have held above, the partnership agreement is a legal and binding obligation between the respective parties. Until that time there is no doubt in our mind that the business was being conducted by Irwin either under the appointment of 1930, signed by the other members of the family, or as managing partner of a family partnership. It is true that Samuel had access to the books and records and that he was employed in the business, but, on the other hand, there is nothing to indicate that any statement of account or report was ever given to any of the heirs by the defendant during this time. Samuel was a signatory to that appointment along with the other heirs and his presence in the business did not give him any more authority than the other heirs, nor did it free Irwin from any duty to account to him any more than to any of the others. The agreement between Ida, Sarah and Irwin as of December 31 contained mutual releases between the parties covering the period prior thereto. However, the agreement between Irwin and Samuel, while reciting an

attempt to state an account, did not state what they considered to be assets of the partnership at that time and did not contain any release by Samuel covering the prior operation of the business. In view of the fact that the parties by their conduct indicated that Samuel owned a one-third interest in the partnership prior to that time, and that all payments for the acquisition of the interests of Ida and Sarah were paid for by partnership funds, the account rendered by the defendant in November, 1945, did not truly portray Samuel's interest in the partnership at the time of Samuel's death. Likewise, since there is no statement of account or memorandum between the parties showing what the partnership consisted of at the time of the partnership agreement on December 31, 1936, it is impossible to state an accurate account of Samuel's interest at the time of his death. Further indication of the uncertainty of the assets of the partnership on December 31, 1936, is the fact that the income was divided on an equal basis between Samuel and Irwin in 1937 and Irwin's handwritten memorandum, given to plaintiff's attorneys shortly after Samuel's death, indicating a cash settlement of some sort between the brothers of $40,000 in 1938. Furthermore, the lack of any mention in the partnership agreement or any other document of any "trust fund," when the same is mentioned in the agreement between Irwin, Ida, and Sarah, is a circumstance casting further doubt upon the true financial relationship between the parties at the time of the new partnership relationship, particularly in view of the fact that Irwin maintained a trustee bank account into which he deposited large sums of money during the period of administration of his father's estate. We, therefore, believe that Irwin should account for the period from his father's death until December 31, 1936.

From the record it appears that Irwin, being the oldest member of the family and having been previously associated with his father in this business, was relied upon by

the other members of the family to conduct the business and that he did occupy a fiduciary relationship to them. Certainly, the relationship which he occupied to his mother, his sister Sarah, and his sister Sadie was somewhat different from that which he occupied with reference to Samuel, because Samuel was there and saw, or could have seen, the results of the carrying on of the business. But, by the same token, there does not appear anything in the record indicating that the appointment was terminated prior to December 31, 1936, nor any statement of account between the partners. Furthermore, it appears from the evidence that this family was one wherein the parties were very close to one another, and it was natural to permit the oldest son to take over the responsibility for the operation and conduct of the family business. He admits that he was regarded as the head of the family and was the most able member in handling business matters.

We realize by our holding that a considerable burden will be placed upon the defendant and we do not mean by this decision to indicate any feeling with reference to the outcome of such accounting or to indicate that this court feels that the defendant has not treated his brother and the other members of his family fairly. Nowhere in this record does it appear that the defendant had ever accounted to the members of the family for his conduct of the family affairs. We, therefore, believe that the chancellor was correct in ordering such an accounting. Family partnerships and the handling of businesses jointly owned by members of the family are very common in this country. It would not have been difficult for the defendant to have periodically rendered an account to various members of the family with reference to his activities during these years in their behalf. If he did render such an account, certainly some copy of it or memorandum of it would be available. It appears that he regularly employed the services of an auditor who was familiar with the affairs

of this firm throughout this entire time. Certainly, ordinary good business judgment on the part of Irwin required that he submit detailed reports from time to time to members of the family, prepared by this or some other accountant. This is not a situation where the records or other information were not available and it is not a situation wherein the defendant was not familiar with usual and customary business practice, therefore his duty to account cannot be excused for either of those reasons. The fact that the family was a closely knit organization and apt to treat one another with reference to their respective needs and not with reference to what they were legally entitled to receive is understandable and commendable, but, on the other hand, the defendant, being a man of wide experience and considerable business ability, knew or should have known, that there might come a time wherein he would be called upon to justify his acts and conduct in their behalf. He should either have kept, and now have available for the accounting, appropriate records indicating his transactions or should have made periodic reports to the various members of the family. Any hardship which he may now undergo has been the result of his own handling of the matter.

We, therefore, hold that the judgment of the Appellate Court be reversed, that the decree of the superior court of Cook County be affirmed insofar as the defendant is ordered to make an accounting, and that the cause be remanded to the superior court of Cook County with directions that the defendant be required to make a full and complete account as ordered by the decree appealed from in accordance with the views expressed in this opinion. The action of the Appellate Court in modifying the decree of September 12, 1947, is likewise reversed.

*Appellate Court reversed; superior court affirmed in part, and cause remanded, with directions.*