NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220088-U

NO. 4-22-0088

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| WILLIAM N. ALWAN, | ) | Appeal from the |
|     Plaintiff-Appellant and Cross-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| KICKAPOO-EDWARDS LAND TRUST, | ) | No. 07L334 |
| CENTENNIAL TRUST, VILLENEAUVE TRUST, and | ) | |
| DENNIS P. LaHOOD, | ) | |
|     Defendants, | ) | |
| (Kickapoo-Edwards Land Trust, Centennial Trust, | ) | Honorable |
| Villeneauve Trust, Defendants-Appellees and Cross- | ) | David A. Brown, |
| Appellants). | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that plaintiff was improperly removed from the three partnerships and its determination of the appropriate relief, as well as the denial of relief on all remaining claims and counterclaims, are not against the manifest weight of the evidence.

¶ 2    Plaintiff William N. Alwan filed a multi-count complaint against three partnerships and one of its managers asserting that he was wrongfully discharged from the partnerships; he brought claims for breach of the partnership agreements, breach of fiduciary duty, and violation of the Uniform Partnership Act (UPA) (805 ILCS 205/100 *et seq.* (West 2006)). Defendants Kickapoo-Edwards Land Trust, Centennial Trust, Villeneauve Trust, and Dennis P. LaHood filed counterclaims seeking damages against plaintiff for capital contributions owed to the partnerships

and, alternatively, for damages resulting from plaintiff wrongfully abandoning his partnership obligations.

¶ 3        Following a bench trial, the trial court found in favor of plaintiff on the wrongful expulsion count, held that plaintiff was entitled to his percentage share of the profits and losses of each partnership upon wind up of the partnerships, and ordered other protections to safeguard plaintiff's interest. The trial court found against plaintiff on his remaining claims and found against defendants on their counterclaims.

¶ 4        Plaintiff appeals, arguing the trial court erred by: (1) finding he was improperly terminated from the Villeneauve partnership; (2) miscalculating the financial relief to which he was entitled; (3) concluding that plaintiff did not contribute the same amount as other partners; (4) denying his requested relief for breach of fiduciary duties and breach of contract; and (5) denying relief under the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)). The partnerships cross-appealed, arguing the trial court's decision denying their counterclaims was against the manifest weight of the evidence.

¶ 5        We affirm.

¶ 6                              I. BACKGROUND

¶ 7        Plaintiff was a partner in three land trust partnerships formed in the late 1970s and early 1980s. The three partnerships, all defendants, are as follows: the Centennial Land Trust partnership (Centennial) (formed December 1, 1975); the Kickapoo-Edwards Land Trust partnership (K-E) (formed January 16, 1979); and the Villeneauve Development Company general partnership (Villeneauve) (formed May 30, 1984). The original partners were a group of friends and businessmen who planned to purchase real estate and develop the properties for profit. Several of the partners—Joseph Rafool, Joseph Alwan (plaintiff's brother), Gerald Couri, and plaintiff—

were partners of each partnership. Phillip Couri (Gerald's brother) was a partner in K-E and in 1999 became the partnerships' attorney. Dennis LaHood, whose father was a partner in K-E and Villeneauve, was not a partner but later became a manager for certain partnership functions. Plaintiff owned a 20% interest in Centennial and a 12.5% interest each in K-E and Villeneauve.

¶ 8                                    A. Pleadings

¶ 9            In 2007, plaintiff filed a complaint against the three partnerships and one of its managers, Dennis LaHood, which was amended in 2011. The amended complaint set forth six counts, specifically: (1) wrongful expulsion from the partnerships (count I); (2) breach of fiduciary duties relating to access to business records and excluding plaintiff from partnership business and profits (count II); (3) violations of the 1917 UPA relating to access to partnership records (count III); and (4) breach of the various partnership agreements relating to access to records and making payments/distributions (counts IV-VI). In August 2018, plaintiff filed an amendment setting forth count VII, which sought to compel defendants' purchase of plaintiff's partnership interests pursuant to sections 601 and 701 of the UPA; however, count VII was later dismissed with prejudice and is not at issue in this appeal.

¶ 10          The defendants filed a counterclaim seeking damages of $342,719.92 against plaintiff for unpaid capital contributions and monies owed to the partnerships; alternatively, the counterclaims sought $479,242.55 in damages for plaintiff's alleged wrongful abandonment of his partnership obligations.

¶ 11          We note that a prior appeal occurred in this case—an interlocutory appeal to the Third District Appellate Court in *Alwan v. Kickapoo-Edwards Land Trust*, 2018 IL App (3d) 170165—wherein the appellate court held that the 1997 UPA applied to all partnerships after 2008. No further amendment of the complaint followed.

¶ 12                                    B. Trial Testimony

¶ 13        The following testimony and evidence were adduced at the December 2021 trial.

¶ 14                                    1. *The Partnerships*

¶ 15        The three partnerships were formed during the late 1970s and early 1980s to purchase land for future developments, and each partner was required to make initial capital contributions. The Centennial and K-E partnership agreements did not expressly provide for further "capital calls"—additional capital contributions from the partners—but Villeneauve contained such a provision at paragraph 7, permitting additional contributions "[w]henever the reasonable demands of the business *** shall require additional capital." These additional contributions were to be "determined by the managing partners" and "contributed by the partners in proportion to their initial capital accounts."

¶ 16        Under the Villeneauve agreement, a failure to make required additional contributions subjected the deficient partner to 8% interest and a continued deficiency beyond 30 days could "be deemed by the Partnership to be a withdrawal from the Partnership by the delinquent partner effective as of the last day of said thirty day period of their intention to treat said failure as a withdrawal by the delinquent partner." Paragraph 17 of the Villeneauve agreement also provided a method for calculating the value of a former partner's share in the partnership, which was to be calculated as of the last day of the month in which dissolution occurs.

¶ 17        Two of the partnership agreements—Centennial and Villeneauve—contained clauses concerning the right of a partner to inspect the books and records. Paragraph 3.02 of the Centennial agreement provided, in part: "The books and records shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives during

- 4 -

reasonable business hours." Paragraph 13 of the Villeneauve agreement contained a similar clause. The K-E agreement did not contain a clause regarding access to the books and records.

¶ 18                    2. *The 1993 Demand for Capital*

¶ 19        Disagreements arose during the early 1990s as to whether plaintiff was current in his capital contributions. In November 1993, Gerald Couri, one of the partners, sent plaintiff a letter stating that, "[a]ccording to Joe Rafool's records," plaintiff was behind $34,751.68 in his contributions; Couri's letter asked plaintiff to make his required contributions. Rafool's daughter, Barbara Rafool-Patterson, who was Rafool's business secretary, testified that Rafool was then managing partner of the partnerships and handled the partnerships' books. Couri's letter further stated that plaintiff had contributed $105,708.26 "over the past 16 years" and specified the amounts paid on four properties—the Cone Property (part of Villeneauve), the Anderson Property (part of Centennial), the Huverstahl Property (part of Centennial), and the Miller Property (part of K-E).

¶ 20        The November 1993 letter prompted a meeting to discuss the alleged deficiency involving plaintiff, plaintiff's then-wife Sally Alwan, plaintiff's son David Alwan (who assisted his father with his businesses), Gerald Couri, and Dennis LaHood (who was then acting as his deceased father's estate representative and was not a partner individually). According to plaintiff, Sally Alwan, and David Alwan, plaintiff had asked for records that justified the claimed deficiency: "documentation of what [plaintiff] *** had contributed and what [the partnerships] were claiming *** he had [contributed]." David testified his father had also asked for documentation of what the other partners had contributed and what they owed. Sally, David, and plaintiff each testified that no such documentation was ever provided to plaintiff by the partnership.

¶ 21    Plaintiff also maintained that he had paid his share, although he had no records to confirm his contributions. According to plaintiff, his records were lost in a fire at one of his businesses.

¶ 22    Handwritten ledger documents purportedly prepared by Joe Rafool were admitted into evidence; they showed that plaintiff had contributed $104,788 to the three partnerships. These ledger sheets, which were purported by counsel to be attached to a 1993 letter from Gerald Couri to plaintiff's then-attorney, Steve Kouri, were shown to David Alwan at trial. Although David testified that he had not seen the letter until the time of trial and that he did not know whether his father, plaintiff, had received a copy, David admitted he had seen the ledger sheets before and that he had wanted more documentation from the partnership. He acknowledged, however, that he did not know whether the partnerships kept the level of detailed documentation he was requesting, and he did not know whether any of the other partners had received any further detailed documentation.

¶ 23    Based on the evidence at trial, it does not appear that the deficiencies in the accounts referenced in the 1993 letter were rectified.

¶ 24                    3. *The Death of Partner Joseph Rafool*

¶ 25    In July 1996, original partner Joseph Rafool died. According to Rafool-Patterson, Gerald Couri and Dennis LaHood met with her at Joseph's office and the two retrieved the partnership checkbooks (one for Centennial/K-E and one for Villeneauve). She testified that Gerald and LaHood also took her father's partnership records, which she described as two roughly foot-tall files of largely handwritten records. She further testified that Gerald and LaHood told her they would make her copies of all the documents, but they never did.

¶ 26    LaHood recalled the interaction differently, acknowledging that Gerald Couri took the two checkbooks but no other records. LaHood also said the meeting occurred shortly before

Joseph Rafool died, not after. At that time, LaHood's only role in the partnerships came in his capacity as executor of his late father's estate. LaHood also testified that he had been told that Joseph's son-in-law burned Joseph's partnership records after his death.

¶ 27                              4. *The Death of Partner Gerald Couri*

¶ 28            In early 1999, original partner Gerald Couri died. In February, LaHood was asked to take over from Gerald Couri as manager of paying bills and invoices and was asked to handle county rezoning issues and property sales. At that time, LaHood took possession of the two checkbooks but not any other records. LaHood testified that he was not the partnerships' general manager and was not a partner in any of the partnerships. Moreover, he only made contributions to the partnership on behalf of his father's estate.

¶ 29            5. *Additional Demands for Capital and Accounting*

*and the 2004 Terminations*

¶ 30            LaHood testified that at some point in the early 2000s—the dates are not clear—plaintiff came into his office and wanted to know what was going on with the partnerships, especially Villeneauve. LaHood said he explained the development plans and then called a partnership meeting, which plaintiff attended. LaHood testified that the partners explained their goals for Villeneauve and "asked [plaintiff] to get his capital input up-to-date, and if he wasn't gonna do it, we'd talk to each other" and "everybody agreed to give him his $104 to 105,000 back, just leave us alone." According to LaHood, plaintiff responded by asking for $1 million.

¶ 31            LaHood then testified that David Alwan had come to his office at some point in 2003 and said, "my family knows that my father's behind on payments" and that "[w]e want to get him updated and back in standing ***." LaHood called a partnership meeting—which plaintiff did not attend—and the partners suggested that plaintiff "could make payments over seven years and

at three percent." This offer was conveyed to David Alwan, who (according to LaHood) said, "okay. That sounds agreeable." LaHood testified that he never received a check from plaintiff, plaintiff's son David, or plaintiff's then-wife Sally.

¶ 32       At the request of the partnerships, LaHood called a meeting with plaintiff in early 2004. LaHood explained that, during the meeting, "I went over exactly what we were doing. We were selling the property in Centennial. We were trying to sell the Kickapoo land, and they had plans before I got involved of a subdivision in East Peoria on Villeneauve." Plaintiff responded by stating he would not pay another penny.

¶ 33       In May 2004, defendant LaHood sent a letter to plaintiff stating the following: "After our meeting of May 17, 2004, you were advised that you must bring your account current within seven (7) days. At that time, I told you that the principal indebtedness you owed was $46,401.68 plus interest at 8%." According to that letter, the partnerships' accounting firm had calculated the additional interest owed on the principal obligation through May 31, 2004, of $146,927.62, which brought the total amount due to the partnership to $194,249.56. The letter continued: "Since you failed to bring your account current as you were advised in our meeting of May 17, 2004, you have been declared in default of your partnerships' ownership, and all your rights and interest in the partnerships ha[s] been terminated."

¶ 34       The letter, however, extended plaintiff "one last opportunity to purge" himself of his default status, by making full payment within one week of the letter. The letter did not set forth the specific amounts owed to each partnership but referenced the same entities listed in the 1993 letter: Cone Development, Kickapoo Development, and Centennial Trust.

¶ 35       LaHood testified that another meeting occurred in August 2004 at plaintiff's then-attorney Bruce Thiemann's office, with Thiemann, David, plaintiff, Phillip Couri, and LaHood

present. LaHood said the meeting was "[t]o see if we [could] iron out the problem with [plaintiff]." LaHood said that, at this meeting, Thiemann asked for documents dating back to 1999, when LaHood had taken over. LaHood said he produced those documents: "Every one. Every single check. The check register. The—the bank statement. All the sales that were made at the time. The tax records. Everything that I had."

¶ 36       Phillip Couri, the partnerships' attorney (and a partner in K-E and Villeneauve), agreed with LaHood's statements, adding: "I went over to Thiemann's office with a box of records. In fact, it may have been a box and a half." Couri stated, "I *** gave him the records so he had all the records of the calculations that I would [have] had."

¶ 37       Terrence McGrath, an accountant for the partnerships, testified that he delivered copies of tax returns from 1981 to 1997 to attorney Thiemann. McGrath acknowledged that he no longer had copies of the tax documents and did not know what had happened to them. LaHood also acknowledged that his copies of the financial documents he produced to Thiemann were destroyed by one of LaHood's business associates.

¶ 38       Although plaintiff denied having ever received documents from the partnership, he acknowledged that copies may have been delivered to his attorney. This was confirmed by plaintiff's son, David, who admitted that "[t]here were records provided that were handwritten records. And we were asking for receipts and documentation to back up and validate the handwritten records. I do remember seeing handwritten records." When asked to be more specific about what additional documents he and his father were looking for, David responded: "Receipts, proof of any documentation of what expenses might have been, how and why we owed more money." Despite these purported productions, plaintiff maintained at trial that he had never received any documents from the partnerships.

¶ 39 According to plaintiff, he paid an additional $24,200 in capital contributions over the documented $105,000 shown in Rafool's handwritten ledger. At least one exhibit offered into evidence noted these additional payments by plaintiff in relation to the "Anderson" property, but the contribution dates are not clear. Moreover, the partnership records produced at trial contained both documents—one ledger sheet with the additions and one without—and no explanation or reconciliation.

¶ 40 6. *Post-2004 Partnership Events*

¶ 41 Centennial ceased doing business in 2013, and K-E ceased operations in 2014. After 2005, the majority of investment occurred in the Villeneauve partnership. It does not appear that any of the partnerships were "wound up" under the UPA.

¶ 42 Valerie Fitzgerald, a certified public accountant, was hired by LaHood in 2021 to "look at the partnership returns, tax returns, and other that were available to give an opinion as to what happened through the years as far as the activity that had happened and the cash—follow the cash through the years." Fitzgerald testified that the original land purchase cost for Centennial was $173,500 in 1977. She said that the final tax return (2013) indicated that the "land was sold, and there was a net profit [for 2013] of $46,185." She testified there were total cash distributions to the partners of $574,964, "and then the partners contributed it to Villeneauve." Her report, which was admitted into evidence, stated that the "advance was to develop the land in Villeneauve and produce further profit." She stated her conclusions on Centennial as follows: "the Centennial Land Trust was profitable in the land that they bought and sold and that the excess funds or some of the excess funds that they had from that sale was then advanced to Villeneauve."

¶ 43 Concerning K-E, Fitzgerald testified that the original land purchase cost in 1977 and 1978 was $160,000. Her report indicated that "[j]ust over 5 acres were sold between 1984 and

1988" for a gross sales price of $93,500, and the remaining acreage was sold in 2014 for $600,000. The closing statement showed a gross sale price of $600,000 from the 2014 sales, from which certain costs were deducted. Fitzgerald said, "[i]t went to pay off a mortgage. It went for commission—real estate commission and then other common closing costs." The remaining $386,000 of the purchase price after the closing costs "were distributed *** for legal fees and other expenses $278,000 and then the remaining [$108,958.89] was distributed to the partners." Fitzgerald then corrected herself, stating that, "[d]istributions is not the correct term," and then explained that some of the cash went to Villeneauve, similar to what happened in Centennial. She concluded that the K-E partnership was "profitable with the land that they had purchased and sold and that there was some of the cash from those sales that was advanced to Villeneauve Land Trust."

¶ 44    As to Villeneauve, Fitzgerald testified that the original land purchase in 1978 was $337,000. She noted an appraisal value in June 2004 of $280,000, which compared to a $403,380 cost basis on the 2005 tax return. She said the 2005 tax return showed "that the cost of the land from the end of 2004 went from 403,000 to 2.8 million" and explained that "[d]uring this time, they were starting to develop the land to be sold as residential lots." She added that, at the end of 2007, the loan balance on the Villeneauve properties was $3.4 million, and at the end of 2008 that number was down to $3,334,000. She explained, "during 2008, the development of the lots was complete and they were starting to sell them, and so the land value between the end of 2007 and 2008 decreased because some of the land was sold."

¶ 45    Fitzgerald said that sale of the Villeneauve lands produced "a loss of $109,654" and an overall loss of "over $1.7 million over those years." She explained, "Villeneauve had some bad luck because right when they were going to start selling their lots, this recession happened so my conclusion was that they likely would have been profitable in their endeavors except for the

- 11 -

timing of it." She said in 2012, the loans from Centennial to Villeneauve went from $379,000 to $463,000 and that at the end of 2012, that number was down to $439,000.

¶ 46    She was asked, "If there was an effort to determine someone's shares as of January 1, 2005, the only data we have is the tax returns showing what was happening at the end of 2004?" She responded, "That's the only information I have is the tax return." Counsel then asked, "Do you know if in the opinion you gave or the educated guess I guess as it was phrased that the overall loss of three corporations put together was [approximately one] million, what effect it would have if you eliminated everything that occurred counter your 2005 forward in Villeneauve?" Fitzgerald answered, "Then there would not be a net loss." Counsel asked further, "How much of your total 1.1 figure is Villeneauve?" to which she answered, "[a]bout 1.9 million."

¶ 47    Fitzgerald said she was not asked to value the partnerships as a valuation expert and was not a land appraiser. She also admitted that she did not have access to the tax records from 1981 to 2005. She also testified that at the end of 2004, the investment in land of Villeneauve was $403,000 and the "total asset picture" for that company was $405,076. There was no mortgage on the Villeneauve property at that time. The expansion of that partnership occurred after 2004.

¶ 48    At the conclusion of plaintiff's case-in-chief, the court directed a verdict in favor of defendant LaHood in his individual capacity on all counts of plaintiff's amended complaint.

¶ 49                              C. Judgment Order

¶ 50    In December 2021, the trial court issued its memorandum order with its conclusion. The court found that plaintiff was wrongfully expelled from the three partnerships, and that he was therefore entitled to his percentage share of the profits and losses of each partnership upon their winding up. He also ordered other protections to safeguard plaintiff's interest, but denied plaintiff's requested relief on all other claims. Concerning the termination claims, the court held: "The court

finds that [plaintiff was] deficient in [his] capital contributions. By how much is difficult to tell due to the incomplete nature of the partnership records. However, even if the [plaintiff was] behind, the partnerships still needed to follow the Act, which they clearly did not do."

¶ 51 Finding that plaintiff remained a partner in all three partnerships, the court ordered that plaintiff was "entitled to [his] percentage of the profits and losses of each of the partnerships, when the partnerships are wound up." Moreover, the court ordered:

> "When doing so, the court directs [plaintiff is] entitled to at least [his] percentage share of the roughly $109,000 distributions to partners that was made in 2014 (as reflected by the accountant's report). Ordinarily, the court would order that such a distributive share would be reduced by whatever shortfall in capital contributions are attributed to [plaintiff]. However, due to the lack of partnership records, that shortfall is impossible to determine with any degree of confidence. As such, while the court finds the so-called terminated partners were behind, it also finds the partnerships are unable to prove the amount of such shortfall. Therefore, the partnerships are not entitled to decrease [plaintiff's] distributive share based upon the deficiencies in the capital contributions as of the date of the purported terminations. Such a result also seems equitable in light of the ongoing operations of the partnerships and the exclusion of the plaintiffs from those activities."

¶ 52 Noting that the next proper step for the partnerships is "that their affairs be wound up pursuant to the provisions of the Act," the court ordered the partnerships to provide plaintiff "with full and complete access to the partnership records, pursuant to the Act," so that he "may participate in the decision making relating to how best to wind up the affairs of the respective

- 13 -

partnerships." The court then denied "the rest of the relief requested by the parties in their respective claims or counterclaims."

¶ 53        This appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55        This case involves a complex set of fact occurring over the course of approximately 40 years. Incomplete business records, the death of several partners, and the partnerships' loose approach to management of their affairs makes the issues even more difficult. We commend the trial court for its effort in navigating these complex transactions and relationships.

¶ 56        Plaintiff's appeal presents three general issues: (1) whether the trial court erred in finding he had been improperly terminated from the Villeneauve partnership; (2) as to his improper termination from Centennial and K-E, whether the court properly determined his damages and partnership share on reinstatement into the partnership and upon wind down; and (3) whether the trial court erred in denying plaintiff's requested relief for breach of fiduciary duty and breach of the partnership agreements. Defendants' cross-appeal challenges the trial court's ruling denying their counterclaims for payment of delinquent capital contributions. Each issue is one of fact, governed by the manifest weight of the evidence standard of review. *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 15 (1993). Under a manifest weight standard, the fact-finder's determinations are affirmed unless an opposite result is clearly apparent. *Id.* (citing *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 192-93 (1989)).

¶ 57                        A. Termination of Plaintiff's Partner Status in

                                Centennial and K-E Partnerships

¶ 58        The trial court concluded that plaintiff was improperly expelled from the Centennial and K-E partnerships. We begin by noting that this issue is not before the court, as appellees have

conceded the correctness of the trial court's ruling on this issue in their appellee brief. Thus, we affirm the trial court on this finding and conclude that plaintiff was wrongfully expelled from and remains a partner in the Centennial and K-E partnerships.

¶ 59                    B. Termination of Plaintiff's Partner Status in

Villeneauve Partnership

¶ 60        The trial court further found plaintiff was ineffectively terminated as a partner in the Villeneauve partnership. According to the trial court, Villeneauve failed to follow its own partnership terms for ousting a partner who failed to make required capital contributions.

¶ 61        "The court's review of [the Villeneauve] partnership agreement shows the partnership, to remove a partner, was required to make a demand on a partner to come current in contributions, and if the partner did not after a certain period of time, the partnership may elect to dissolve." The court continued, "There is no evidence that any one or all the partnerships ever elected to dissolve" and, in fact, "continued their activities well after the so-called termination" in 2004-05. The trial court concluded, "even though the Villeneauve partnership agreement had a mechanism for removal, it was not utilized properly."

¶ 62        Even looking to the terms of the UPA, the court observed, none of the Act's dissolution provisions "appear to apply to the factual situations presented herein." The court found "[t]here was no proof of unanimous vote of the partners" on plaintiff's removal. Based on these conclusions, the trial court found, "neither by the terms of the agreements nor by the terms of the [UPA], [was plaintiff] properly removed" as a partner. As such, the court found that plaintiff remained a partner in Villeneauve.

¶ 63        Again, our review of the trial court's findings is under the manifest weight of the evidence standard. It is well understood that a judgment should be affirmed where "the record

contains any evidence to support the trial court's judgment." *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010). Here, plaintiff has failed to identify or explain how the trial court's decision on Villeneauve is against the manifest weight of the evidence. Evidence was presented that the Villeneauve partnership gave notice of termination (May 2004 letter) and considered plaintiff terminated (January 2005 letter), but there is little to no evidence concerning what happened next, other than that the partnership moved forward without plaintiff's involvement. While this perhaps suggests an understanding that plaintiff had been terminated, this implicit conclusion does not satisfy the Villeneauve partnership agreement's termination provision or even the UPA. No evidence was presented concerning a partnership vote; and while the trial court is correct that it appears some partners may have consented to LaHood providing plaintiff with notice of termination, there is no evidence of an actual vote and no evidence that any representative of Joseph Rafool, who was at that time still a partner, voted to terminate plaintiff.

¶ 64        We conclude there is sufficient evidence in the record to support the trial court's finding that plaintiff was not properly terminated from Villeneauve because the partnership agreement's provisions were not properly utilized, and we find that the trial court's finding was not against the manifest weight of the evidence.

¶ 65                    C. Breach of Fiduciary Duty—Self-Dealing

¶ 66        The trial court denied relief on plaintiff's claims of breach of fiduciary duty regarding operation of the partnership and alleged self-dealing, finding that "[b]y all indications, the partners continued their efforts to make profits and develop out and sell the respective parcels." The court further found that plaintiff failed "to prove actual self-dealings by certain individuals being compensated for their services out of a closing on the sale of one of the parcels." The trial

court held, "[t]hose payments were done with the full knowledge of the partnerships, not in secret, and there was inadequate proof that the payments weren't appropriate or reasonable."

¶ 67        Similarly, the trial court rejected "the claim that it was wrong for Centennial and [K-E] to loan cash to Villeneauve. There was no evidence that such a transaction was underhanded or done with an improper purpose." Moreover, the court concluded that "the loans or transfers further support[ ] the conclusion that the overall business purpose of the partners was to develop out all of the properties, not just one or two." According to the court, "While it might be easy for [plaintiff] to second guess the investment into the Villeneauve development after the fact, the 2008 downturn in the market and the resulting losses by Villeneauv[e] don't amount to malfeasance or misconduct, just bad timing."

¶ 68        In a bench trial, the trial judge is the trier of fact. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27 (citing *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23). "The trial court is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive." *Id.* (citing *Battaglia*, 2015 IL App (1st) 142437, ¶ 23). Our standard of review is one of manifest weight of the evidence and we decline to disturb the trial court's findings unless an opposite result is apparent. "If the record contains evidence to support the trial court's judgment, the judgment should be affirmed." *Wilson*, 238 Ill. 2d at 570. We find that the trial court's rationale for its ruling is sound and supported by the record, and it is not against the manifest weight of the evidence.

¶ 69                          D. Partnership Records

¶ 70        Plaintiff raises two contentions with respect to partnership documents. First, he argues that he was improperly denied access to various partnership records, and second, he argues

for damages due to the purported destruction of partnership records. We address these contentions separately. He frames these claims under several legal theories.

¶ 71                                         1. *Access to Financial Records*

¶ 72        Plaintiff's claims of breach of partnership agreements, breach of fiduciary duty, and violations of the UPA relate primarily to his claim that he was denied access to various partnership records. Plaintiff points to several clauses in the various partnership agreements, as well as the UPA, which guarantee each partner access to partnership records. Similarly, plaintiff complains that the records provided were incomplete. Plaintiff advocates application of the presumption of *Couri v. Couri*, 95 Ill. 2d 91, 98 (1983), that all doubts and obscurities created by a party's own negligent failure to keep adequate records should be "properly resolved against him."

¶ 73        Here, the trial court denied plaintiff's claims regarding any breach of fiduciary duty, breach of the partnership agreements, and violation of the UPA, but ordered that the partnerships "provide [plaintiff] with full and complete access to the partnership records, pursuant to the Act, so [he] may participate in the decision making relating to how best to wind up the affairs of the respective partnerships."

¶ 74        Our standard of review on this issue is the manifest weight of the evidence. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006). To reverse, an opposite result must be clearly apparent. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Here, it was the trial judge's prerogative to determine the credibility of the witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidentiary record. *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 84 (citing *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 376 (2004)).

¶ 75        We conclude that the trial judge could well have found that partnership records were kept, albeit handwritten, and that partnership records were delivered to plaintiff's former counsel, Bruce Thiemann, at some point in 2004. Although plaintiff testified that he "never received any records," he did acknowledge that some were possibly given to his attorney. Moreover, his son, David Alwan, admitted that documents were given to Thiemann and that he had reviewed them. Our conclusion is further supported by the testimony of LaHood, Phillip Couri, and McGrath, who each testified that partnership records and tax records were delivered to attorney Thiemann. LaHood said these records covered 1999-2005, which were the years plaintiff's attorney had requested.

¶ 76        We also decline plaintiff's invitation to apply the presumptions outlined in *Couri* against the various partnerships. In *Couri*, two brothers were involved in a dispute over the dissolution of a partnership. During the litigation, the defendant, who was the managing partner and responsible for virtually all financial aspects of the partnership, was ordered to preserve all financial records. The records, however, were partially destroyed, and what remained were incomplete or not in compliance with established accounting procedures. At trial, the court resolved all doubts and obscurities created by the defendant's "own negligent failure to keep adequate records" against the defendant, based on his duty as managing partner responsible for all financial aspects "to maintain regular and accurate records and to account for partnership transactions." *Couri*, 95 Ill. 2d at 98 (citing *Altschuler v. Altschuler*, 410 Ill. 169, 196-97 (1951)).

¶ 77        Plaintiff asks this court to apply this same presumption in this case, *i.e.*, to construe all inferences created by the lack of complete financial records *against the partnerships*. In *Couri*, however, the individual defendant was the partner responsible for maintaining financial matters and was under court order to preserve all financial documents. The court made it clear that it was

his individual actions as a managing partner that gave rise to his particular duty; the partnership was not named as a party. In this case there were several partners—some of whom are now deceased—who served as financial managers. None of these former partners were named as *individual* defendants here, unlike the facts in *Couri*. Moreover, Dennis LaHood, a manager for the partnerships who was named as a defendant below but was dismissed on a directed verdict, is also not a party to this appeal. Finally, unlike *Couri*, there was no order in this case to preserve financial records. Plaintiff is essentially asking this court to infer a presumption against the entirety of the partnerships—of which he is a partner—based on the purported actions of various non-party individuals. We do not read *Couri* so broadly, and we decline to impose such a presumption.

¶ 78    The record here was sufficient for the trial court to conclude that sufficient partnership records were kept and produced; we will not reverse simply because there is contrary or conflicting evidence. See *Scalise v. Board of Trustees of the Westchester Firemen's Pension Fund*, 264 Ill. App. 3d 1029, 1035 (1993) (A finding may not be against the manifest weight of evidence even if there is "some evidence" contradicting it.). Stated another way, "[i]t will not suffice to show that the record will support a contrary decision; rather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488 (2004).

¶ 79    The trial court's conclusion that plaintiff failed to prove his claim with respect to the creation and sharing of partnership records is not against the manifest weight of the evidence.

¶ 80                         2. *Destruction of Financial Records*

¶ 81    Although not pleaded as a separate issue, plaintiff spends considerable time here on the alleged destruction of documents by various partners or individuals acting on behalf of those partners. Plaintiff contends that records were burned by the Rafool estate, that LaHood lost records,

and that the accountants lost tax documents. This argument appears most significantly as part of plaintiff's written argument relating to breach of a fiduciary duty. However, a cursory examination of the amended complaint shows that the alleged breach of fiduciary duty related solely to *access* to records and did not seek any relief based on the *destruction* of records. For this reason, we conclude that the arguments of record destruction are irrelevant and that any issue relating to records destruction has been forfeited and is not before this court. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("[I]ssues not raised in the trial court are deemed waived and may not be raised for the first time on appeal.").

¶ 82 Moreover, plaintiff has also failed to identify what relief he should have been granted due to the alleged destruction of records. We note that the trial court addressed plaintiff's destruction of records arguments and found "the lack of documentation is not dispositive of the case." In its discussion of the partners' capital contributions, the trial court observed:

¶ 83 "Plaintiffs point the finger at the partnerships for not having the documentation, while some witnesses point their finger at the Rafool Estate for destruction of documents, or at least not stopping the destruction of evidence. In addition, there was no explanation as to why plaintiffs don't have their own records of what they contributed over the years."

¶ 84 Again, the breach of fiduciary duty claim did not plead anything concerning improper destruction of records, and there were also no claims for spoliation of evidence. Like the trial court, we conclude the state of the documentation and who might be responsible for its destruction—if it even occurred—do not coherently connect to any of plaintiff's claims or alleged injuries.

¶ 85 E. Operation of Partnerships as a Single Business

¶ 86　　　　　Plaintiff further asserts the trial court erred by concluding that the three partnerships, despite having separate and distinct partnership agreements, and at times, different partners, were operated as a single business. The trial court expressly pointed out that "a straightforward application of the Partnership Act or review of the agreements won't resolve the disputes herein largely because the partners' conduct over the decades wasn't always, or even often, consistent with the Act and/or oftentimes even their various written agreements." As a result, the trial court's order stated, it had been tasked to "figure out how the partnerships were actually operated (which better represents the intent of the partners than perhaps the partnership agreements do)."

¶ 87　　　　　Even after careful review of the court's order and plaintiff's arguments, we cannot decipher how this conclusion by the trial court is in any way a detriment to plaintiff. Moreover, at no place in his amended complaint does plaintiff reference any claim based on the purported singular operation of the three partnerships. Equally so, plaintiff fails to cite any authority to this court supporting his claim that such a conclusion is in legal or factual error. We, therefore, conclude this issue is not relevant to our disposition and disregard plaintiff's arguments on this point.

¶ 88　　　　　　　　　　F. Unequal Capital Contributions

¶ 89　　　　　Plaintiff also takes issue with the trial court's conclusion that he did not make the same capital contributions as the other partners. In its order, the trial court found that plaintiff was "deficient in [his] capital contributions. By how much is difficult to tell due to the incomplete nature of the partnership records." Here, we again note that our review of the trial court's ruling is under a manifest weight of the evidence standard. "[I]f the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *151 Interstate Road Corp.*, 209 Ill.

2d at 488. Once again, it is difficult to correlate this argument to a specific claim and the relief sought in that claim. Evidence was produced that supported that conclusion. The handwritten ledgers showed that the contributions were uneven, as did the letters sent to plaintiff. Moreover, LaHood testified that David Alwan acknowledged that the family knew plaintiff was behind in his contributions. This evidentiary basis is sufficient to sustain the trial court's conclusion, and we decline to disturb that finding on review.

¶ 90        As a further point, we can only assume that this argument has some relationship to plaintiff's basic argument that he was improperly terminated from the partnerships—if the capital contributions were not deficient, then there would have been no basis for the terminations. Since the trial court found all three partnership terminations were improper, reinstated plaintiff as a partner, and ordered that any profit distributions were not to be offset by any capital contribution shortfalls, it is difficult to see how this issue is connected to any relief plaintiff might obtain.

¶ 91                    G. Claims Under the Uniform Fraudulent Transfer Act

¶ 92        As a final argument, plaintiff asserts the trial court erred by failing to apply the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.*(West 2006)). Not only has plaintiff failed to cite any legal authority for this proposition, but it appears that the issue was never raised below beyond a passing reference during closing arguments. See *Wagner v. City of Chicago*, 166 Ill. 2d 144, 147 (1995) ("[A]s a general rule, any issue not raised at the trial court level is waived.") (citing *Fawcett v. Reinertsen*, 131 Ill. 2d 380, 386 (1989)). Indeed, this failure is admitted by plaintiff in his reply brief. Therefore, we find this issue is forfeited on appeal.

¶ 93                            H. Relief

¶ 94        The trial court awarded plaintiff relief as follows: (1) plaintiff was reinstated as partner in each partnership; (2) when the partnerships are wound up, plaintiff will be entitled to

his percentage share of the profits and losses of each partnership; (3) when distributing profits and losses, plaintiff will be entitled to "at least [his] percentage share of the roughly $109,000 distribution to partners that was made in 2014 (as reflected in the accountant's report)"; and (4) the partnerships are "not entitled to decrease [plaintiff's] distributive share" based upon his deficiencies in capital contributions "as of the date of the purported terminations." The court further ordered the partnerships to provide plaintiff with "full and complete access to partnership records" so that he "may participate in the decision making relating to how best to wind up the affairs of the respective partnerships."

¶ 95          Plaintiff makes two main arguments here. First, he argues that the trial court erred by finding he was only entitled to receive a proportionate share from the $109,000 distribution at the time of the Centennial closing in 2014. As part of this argument, he contends that the trial court's ruling (1) failed to allow him any recovery from K-E; (2) makes no accounting of the earlier Centennial sales; and (3) ignores certain sums that were taken from the partnership by LaHood and Phillip Couri for undocumented fees and loans. Second, he argues that the trial court erred in adopting his data for the calculation of damages, namely the materials contained in exhibit E-155.

¶ 96          On the first argument, the trial court's finding respecting the $109,000 distribution in 2014 does not in any way limit plaintiff from recovering, if appropriate, additional monies from K-E at the time the partnerships are wound up. The court found that plaintiff was "entitled to [his] percentage share of the profits and losses of *each of the partnerships*, when the partnerships are wound up." (Emphasis added.) It further concluded that none of the partnerships were legally wound up, as defined under the UPA. But more importantly, the language complained of—the court's reference to the $109,000—is stated as a *minimum* entitlement. The court stated, "When

[winding up the partnerships], the court directs [plaintiff is] entitled to *at least* [his] percentage share of the roughly $109,000 distribution" from 2014. (Emphasis added.) This statement is in no way a limitation upon plaintiff's ability to recover, but instead establishes a minimum threshold of distribution to which plaintiff is entitled. We find the trial court's language is not as restrictive as plaintiff contends.

¶ 97        As to plaintiff's ability to recover for prior sales and his arguments that LaHood and Couri took undocumented fees and loans, plaintiff's arguments fail to cite any portion of the record and cites no supporting legal authority, both of which are clear violations of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 43. "The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12. We decline to consider these issues.

¶ 98        As to the second argument, we note that exhibit E-155 was, at best, a demonstrative exhibit; it was not admitted into evidence and was not considered by the trial court in any form or fashion. While plaintiff references several financial exhibits—which apparently went into the loss/profit numbers set forth in exhibit E-115—he offered no supporting testimony and certainly no expert testimony to make sense of these exhibits. Moreover, while several of the exhibits referenced by plaintiff from the years 1977-2014 show property sales, they fail to present a complete picture. As the evidence revealed at trial, many tax records from these early years are no longer available and the K-1 statements do not appear to be complete. While we make no factual findings on review, we note that the trial court could have readily drawn these same conclusions in deciding not to award the relief plaintiff now seeks. Without a more complete record and without some testimony explaining the records, we cannot do so on appeal. "[I]t is well settled that all

- 25 -

reasonable presumptions are in favor of the action of the trial court and that the burden is on the appellant to show affirmatively the errors assigned on review; he has the burden of overcoming the presumption that the trial court's judgment was correct." *Behrstock v. Ace Hose & Rubber Co.*, 147 Ill. App. 3d 76, 86 (1986).

¶ 99    We conclude that the trial court's determination of the appropriate relief was not against the manifest weight of the evidence.

¶ 100                    I. Defendants' Counterclaims/Cross-Appeal

¶ 101    The partnerships filed counterclaims seeking damages for unpaid capital contributions to each of the partnerships and alternatively sought damages caused by plaintiff's alleged failure to honor his partnership obligations. The latter claim, count IV, is not raised on appeal and is not considered.

¶ 102    The trial court denied all relief on the counterclaims without comment but indirectly referenced the substance of defendants' counterclaims when in addressing the relief awarded to plaintiff. After awarding plaintiff his percentage share of the profits and losses of each of the partnerships when they are "wound up," the court stated:

> "Ordinarily, the court would order that such a distributive share should be reduced by whatever shortfall in capital contributions are attributed to [plaintiff]. However, due to the lack of partnership records, that shortfall is impossible to determine with any degree of confidence. As such, while the court finds the so-called terminated partners were behind, it also finds the partnerships are unable to prove the amount of such shortfall."

The court, therefore, concluded, "the partnerships are not entitled to decrease [plaintiff's] distributive share based upon the deficiencies in the capital contributions as of the date of the

purported terminations." The court then observed, "[s]uch a result also seems equitable in light of the ongoing operations of the partnerships and the exclusion of [plaintiff] from those activities."

¶ 103　　　These findings, although made as part of the court's discussion of plaintiff's various termination/expulsion claims, nevertheless dispense with the matters asserted in the counterclaims seeking recoupment of the capital contributions.

¶ 104　　　Under Illinois law, a claimant seeking damages in a breach of contract action must " 'establish an actual loss or measurable damages resulting from the breach in order to recover.' " *In re Illinois Bell Telephone Link-Up II & Late Charge Litigation*, 2013 IL App (1st) 113349, ¶ 19 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 149 (2005)). It is also the claimant's obligation to establish a reasonable basis for computing damages. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 130 (2008); *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 107 (2006). Thus, damages must be proved with "reasonable certainty and cannot be based on conjecture or speculation." *Cadle Properties of Illinois, Inc., Fortune Investments, LLC*, 2021 IL App (1st) 200556, ¶ 44. Here, the partnership failed to meet that burden.

¶ 105　　　Here, we agree with the trial court that defendants have presented insufficient evidence of their damages, nor have they provided a reasonable means to calculate the deficient capital contribution amounts. Consequently, the trial court's ruling is not against the manifest weight of the evidence.

¶ 106　　　　　　　　　　　III. CONCLUSION

¶ 107　　　For the reasons stated, we affirm the trial court on all grounds.

¶ 108　　　Affirmed.